UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREW DAVISON and CAPE COD BIOFUELS, INC., <br> Plaintiffs, <br><br> v. <br><br> TOWN OF SANDWICH, <br> JASON VIVEIROS, THOMAS CORRIVEAU, <br> GEORGE RUSSELL, and GEORGE H. DUNHAM, <br> Defendants. | CIVIL Action <br> No. _____ |

COMPLAINT

1. This is an action arising under the United States Constitution, the Massachusetts Constitution, 42 U.S.C. §1983, M.G.L. c.12, §§11H & 11I, M.G.L. c.41, §111F, and Massachusetts common law. This action is about Mr. Davison's exercise of his right of free speech and petition on matters of public concern and the threats, intimidation, coercion, and retaliation which he suffered for exercising that right, including his termination from employment in violation of his rights and state statutes.

2. The Town of Sandwich Fire Department (the "Department") is a public department that is in disarray, where favored firefighters can violate the rules and the law with impunity and disfavored firefighters get punished for the very same conduct. Any person within the Department who opposes the Department's favored position on matters of public concern or who simply has the temerity to argue for compliance with the law, faces threats, intimidation, coercion, and retaliation. At all times, the Town has been well-aware of the misconduct of its supervisors in the Department and, as a matter of long-standing practice, the Town chooses to ignore the misdeeds and instead chooses to punish those who exercise their rights.

3.     In connection with this action, Mr. Davison seeks declaratory and permanent injunctive relief requiring that he be rehired and also that he be reimbursed and receive compensatory damages, punitive damages, and his attorney's fees.

## PARTIES

4.     Plaintiff Andrew Davison is a resident of Sandwich, Massachusetts, residing at 350 Quaker Meetinghouse Road in East Sandwich. As noted below, at the relevant times he was a firefighter working for the Town of Sandwich.

5.     Plaintiff Cape Cod BioFuels, Inc. ("CC BioFuels") is a corporation organized under the laws of the Commonwealth of Massachusetts. It has a usual place of business at 14B Jan Sebastian Drive, Sandwich, Massachusetts.

6.     The Defendant Town of Sandwich is a political subdivision of the Commonwealth of Massachusetts and it was first incorporated in 1639.

7.     Defendant Jason Viveiros was, at various times relevant to this action, a lieutenant in the Department. Viveiros was also the president of the Sandwich firefighters' union local. Viveiros wanted to be appointed Fire Chief for the Town and acted to curry favor with other senior administrators in the Department and within the Town. Recently, when he was not appointed Fire Chief, he left the Department to become the Fire Chief in the Massachusetts town of Halifax. He resides at 4 Pine Street, Kingston, Massachusetts. As is more fully set forth below, Viveiros was acting under color of law and he conspired with the other Defendants and others who acted under color of law to deprive Mr. Davison and CC BioFuels of their constitutional rights.

8.     Defendant Thomas Corriveau was, at various times relevant to this action, the Deputy Chief of the Department. He now resides at 155 Clyburn Street, Marco Island, Florida.

As is more fully set forth below, Corriveau was acting under color of law and he conspired with the other Defendants and others who acted under color of law to deprive Mr. Davison and CC BioFuels of their constitutional rights.

9. Defendant George Russell was, at various times relevant to this action, the Chief of the Department. He resides at 17 Prince Path, Sandwich, Massachusetts. As is noted more fully below, Russell was acting under color of law and he conspired with the other Defendants and others who acted under the color of law to deprive Mr. Davison and CC BioFuels of their constitutional rights.

10. Defendant George H. Dunham was at all times relevant to this action the Town Manager for the Town of Sandwich. He resides at 35 Clipper Circle, Sandwich, Massachusetts. At all times relevant, Dunham was acting under color of law and he conspired with the other Defendants and others who acted under color of law to deprive Mr. Davison and CC BioFuels of their constitutional rights.

## JURISDICTION AND VENUE

11. This Court has original jurisdiction pursuant to 28 U.S.C. §1331 (federal question) and §1343(a)(3) (civil rights). This Court has pendent and supplemental jurisdiction over the non-federal claims pursuant to 28 U.S.C. §1367.

12. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events and/or omissions giving rise to these claims occurred in this District.

## FACTS

13. The Town of Sandwich (the "Town") has a long, proud history in this Commonwealth, being the first town incorporated on scenic Cape Cod. Blessed by many

advantages and natural beauty, the Town nonetheless hides from public view much more unseemly attributes, including a Department where employment and advancement have less to do with merit and more to do with whether the individual espouses views on public issues shared by Department management and Town management. This is not the first time that claims have been made against the Town for violation of First Amendment rights or violation of contract and statutory provisions protecting Town employees.

## Background

14. Prior to 2002, Andrew Davison served the town of Barnstable as an on-call firefighter. He loved the work and, in July 2002, Mr. Davison was appointed as a full-time firefighter for the Town of Sandwich. As required, he joined the union and paid his dues. Over the next decade, he compiled a solid record of service to the Sandwich community, a community in which he lives.

15. Under Massachusetts law, the Town could, if it wished, bar its firefighters from having any employment outside of the Department. The Town has not done so. Rather, the Town, in negotiation with the firefighter's union, has actually adopted a Department work schedule that not only permits but actually promotes outside employment by Town firefighters. By contract, the hours worked by a firefighter are 24 hours on, 24 hours off, 24 hours on, and then five consecutive days off.

16. This type of schedule, contractually agreed upon, saved the Town money because, by promoting outside employment, firefighters do not have to depend solely on their compensation from the Town to support themselves and their families. If the Town banned outside employment or if the Town adopted a work schedule that substantially interfered with the

ability of firefighters to hold outside employment, then the Town would have to pay its firefighters considerably more.

17. The vast majority of firefighters in Sandwich supplemented their Town income. At times, as many as 80% of the nonsupervisory firefighters worked another job, which could mean they managed rental property, worked as a contractor, served as a travel agent, served as a broker, or owned and operated an independent company. Virtually all of the supervisory personnel in the Department also had second sources of income, including teaching, selling real estate, or managing rental real estate, and the like. So many firefighters worked outside the Department that one way to squeeze or pressure a firefighter or to force him or her out of the Department is to prevent that individual from working outside the Department.

18. Like so many others in the Department, Mr. Davison had other business interests. He had such business interests before he was hired as a regular firefighter. In his early years as a Town employee, Mr. Davison worked part-time as a contractor. Then, beginning in 2006, he became part owner of CC BioFuels. Just as other firefighters did not hide their secondary sources of income, Mr. Davison did not hide his relationship with CC BioFuels. It was well-known by his supervisors in the Department at the time, without any complaint whatsoever.

19. In general, before the events in question here, Mr. Davison had good relations with the other members of the Department.

Davison Initial Injury

20. On or about November 2, 2011, Mr. Davison suffered an injury to his shoulder in the line of duty. Mr. Davison injured his shoulder lifting the 92-year-old spouse of a patient into the front seat of an ambulance so that the spouse could go with the patient to the hospital.

21. The Department offers no light duty to firefighters who have been injured. Accordingly, beginning on or about November 4, 2011, Mr. Davison was granted a medical leave of absence from his duties as a firefighter. His injury prevented him from the strenuous work of a firefighter, but it certainly did not prevent him from completing the daily tasks of life or, for that matter, his responsibilities at CC BioFuels. Mr. Davison remained on medical leave ("Chapter 41 leave") under G. L. c.41, §111F through and to September 2, 2012. As directed by the Department, he had both surgery and physical therapy.

22. Like so many Town firefighters before and after him, Mr. Davison continued to perform light tasks for his second source of income, CC BioFuels, while he was out on Chapter 41 Leave. Like so many Town firefighters before him, Mr. Davison did not attempt to hide that he continued to work light duties at his second source of income while he was on Chapter 41 Leave. Prior to August, 2012, no one at the Department cared.

<u>Debate over Public Safety Complex</u>

23. Beginning in or before June 2012, Town administrators recommended to the Town that the Town develop a massive "Public Safety Complex" to house police, fire and other Town operations. As devised by the Town administrators and supported by the Department supervisors, the new Public Safety Complex would cost Town taxpayers over $30 million.

24. Town administrators and Department supervisors knew that obtaining approval for this project would be difficult because of the size of the project, the need to gain approval from a super-majority of voters at Town Meeting, and the perception that the project was laden with unnecessary bells and whistles. Beginning as early as the Town's July 4th celebration in 2012, Town officials, administrators, and Department supervisors began campaigning for the project with leaflets and other messaging.

6

Defendants Retaliate Against Plaintiffs For Their Free Speech

25.   Mr. Davison was and is a taxpayer in the Town.  As a town resident and taxpayer, he has an interest in the Town's proposed expenditures.  At a time when many Cape families were still suffering from the lingering effects of the recession, he thought that spending $30 million on an enormous Public Safety Complex was absurd.  In July 2012, he put up a large sign at his home condemning the project.  His home is on Quaker Meetinghouse Road, a well-traveled road not far from the high school.  The response of the Department supervisors was swift.

26.   On information and belief, senior supervisors in the Department were promptly told about Mr. Davison's sign.  In response, they decided to pressure Mr. Davison to take the sign down by telling him he could not derive income from, or perform tasks for, CC BioFuels during his Chapter 41 Leave.  Coincidentally, there had been several favorable newspaper articles about CC BioFuels featuring Mr. Davison during the summer of 2012.

27.   On or before August 3, 2012, Defendant Corriveau chose to meet with Mr. Davison.  Prior to that meeting, Mr. Davison heard from Defendant Viveiros, who told Mr. Davison that Defendant Corriveau was going to call him out about his work for CC BioFuels and that if Mr. Davison knew what was good for himself, he would "take the [expletive] sign down." Mr. Davison did not take the sign down.  He was, however, upset that his free speech could get him into trouble with the Department.

28.   On or about August 3, 2012, Defendant Corriveau spoke with Mr. Davison when he came to the Department as he was required to do with a note about his medical status. Knowing that he could not overtly criticize Mr. Davison about his sign, Corriveau accused Mr. Davison of publicizing his work for CC BioFuels by being quoted in the newspaper and on-line

and discussing the benefits of this type of recycling. Mr. Davison never denied that he was a part-owner of CC BioFuels and he said that he and CC BioFuels had every right under law and the First Amendment to promote environmental issues and the work of CC BioFuels.

29. Corriveau was visibly disappointed that Mr. Davison was not cowed. Corriveau then told Mr. Davison that he was in violation of a Department Rule prohibiting work during Chapter 41 Leave. Mr. Davison responded that numerous others in the Department had continued to work during Chapter 41 Leave and that he should not be singled out merely because of his ownership of and connection to CC BioFuels or that his ownership and administrative duties there had appeared in newspaper articles. Mr. Davison further advised Defendant Corriveau that his point was likely moot because Mr. Davison did not expect to be out on Chapter 41 Leave much longer (i.e., did not expect to be "out of the Department" much longer). It made no difference to Corriveau, who had, on information and belief, already talked with Defendant Russell, about the opportunity to cite Mr. Davison for a violation of the previously unenforced rule as retribution for Mr. Davison's opposition to the Public Safety Complex.

30. Following his meeting with Mr. Davison on August 3, 2012, on information and belief, Defendant Corriveau spoke with Defendant Russell who had, by pre-arrangement, already decided to issue a citation to Mr. Davison because the newspaper articles about CC BioFuels gave him what he thought was a viable pretext so that he could retaliate against him for his large sign. Defendant Russell asked Defendant Corriveau to "write-up" his August 3 meeting with Mr. Davison and to do so to convey Mr. Davison's unrepentance. Four days later, Defendant Corriveau did so and, in the process, among other distortions, he changed Mr. Davison's statement that he did not expect to be out of the Department much longer into a supposed comment that Mr. Davison did not expect to be working <u>for</u> the Department much longer. He

also turned Mr. Davison's advice that he had recently been interviewed by another news outlet on CC BioFuels into some sort of bragging.

31. On or about August 15, 2012, in coordination with Defendants Corriveau and Viveiros, Defendant Russell wrote to Mr. Davison and on August 17, 2012, Defendant Russell directed Mr. Davison to Cease and Desist from working with CC BioFuels. On information and belief, even though the Defendants are well-aware of other firefighters who have worked at more physically demanding jobs during a Chapter 41 Leave, Mr. Davison is the only firefighter ever to receive such a written order. The other Defendants used Defendant Viveiros as their messenger to let Mr. Davison know that the real problem was his sign. Moreover, taking action against Mr. Davison because he had been quoted as a principal of CC BioFuels in newspaper articles also violated Mr. Davison's and CC BioFuels First Amendment rights.

32. On or about August 20, 2012, Mr. Davison was scheduled to meet with Defendant Corriveau, Defendant Viveiros, and the Vice President of the union local. Prior to this meeting, Defendant Viveiros made sure that Mr. Davison again received his "friendly advice" to take the sign down.

33. At the August 20, 2012 meeting, Mr. Davison reiterated that he had a right to own another business (which he had never sought to hide), that he and that business had a right to publicize and promote the environmental benefits of recycling conducted by that business, and that he had a right to perform multiple administrative tasks for that business, whether he was working for the Department or out on Chapter 41 Leave. He pointed out the absurdity of the Department offering no light duty work but trying to prevent him from doing administrative tasks for a company he owned. He challenged them to explain why he had been singled out.

34. Moreover, the Department had violated its own rule. While Mr. Davison was out on Chapter 41 Leave he was required to attend retraining and recertification programs for which the Department paid him overtime. It was arbitrary and capricious for the Department to require him to work during Chapter 41 Leave but then say that he could not even perform administrative tasks elsewhere.

35. On September 4, 2012, Mr. Davison returned to work at the Department, as he had previously predicted on August 3. Since he was no longer on Chapter 41 Leave, the Department no longer had any conceivable pretext for proceeding against him. Accordingly, on September 27, Defendant Russell ended the prior proceedings by giving Mr. Davison a "written reprimand" but no other sanction. Defendant Viveiros advised Mr. Davison that he could <u>not</u> appeal or grieve such a reprimand because there was no adverse action being taken against him. Defendant Viveiros falsely stated that he had checked with the Union's lawyer on this. That was not true; he never checked with the Union's lawyer but rather he simply did not want Mr. Davison to have the union appeal or grieve this reprimand.

36. Mr. Davison continued to display his large sign against the Public Safety Complex and thereafter, in December 2012, a newspaper article appeared discussing the sign. Although Defendant Dunham told the newspaper reporter that Mr. Davison was permissibly exercising his First Amendment right by opposing the Public Safety Complex, the Town and Department administrators continued to seethe about this opposition. In an attempt to blacken Mr. Davison's name and undercut his opposition, Town administrators falsely told the press that Mr. Davison was a tax delinquent. The Town knew that the so-called tax delinquency pertained to a property that Mr. Davison had not owned for years, but they highlighted the false

information to the press hoping to blunt Mr. Davison's criticism of the Town Public Safety Complex.

37. In January 2013, Mr. Davison took the controversial sign down. But that did not quell the Department and the Town's antipathy. Firefighters who were friends of Mr. Davison were warned not to be seen as friendly to him or they would find themselves guilty by association.

38. In the meantime, the physical therapy that the Department had required Mr. Davison to undergo was placing a strain on his nerve. In March 2013, Mr. Davison was forced to go on Chapter 41 Leave again because he had lost feeling and experienced numbness in one of his hands and could not feel hot or cold in that hand. Mr. Davison's treating physician concluded that this loss of use of his hand was the proximate result of the physical therapy inappropriately required by the Town after his original injury.

<u>Town Meeting Rejects Public Safety Complex</u>

39. The Town Meeting that would consider the Public Safety Complex was scheduled for May 2013. It was the talk of the town. As Town Meeting approached, Mr. Davison again put up his sign, which again was disliked by the Town administrators and the Defendants. The controversy over this overblown project was real. To counter opposition from firefighters like Mr. Davison, the Town had one or more uniformed firefighters, who were being paid to do so, attend Town meeting and speak in favor of the project. Mr. Davison attended the Town Meeting on his own time with several other firefighters who were opposed to the project. On May 28, 2013, Mr. Davison filed an inquiry with the state ethics board about the Town paying its employees to attend Town Meeting to support the project. Filing such an inquiry was a protected, First Amendment activity.

40. At the same time, Defendant Viveiros advised the firefighters that Mr. Davison's sign was interfering with the successful completion of the union's contract negotiations with the Town. Defendant Viveiros, who wanted to curry favor with Town administrators and other Department supervisors, repeatedly told firefighters that Mr. Davison's free speech had "spoiled it for us all" and was going to hurt all firefighters. Defendant Viveiros made it plain that the Town was going to exact some revenge.

41. The Public Safety Complex was defeated at Town Meeting in or about May 2013 since it did not receive the super-majority it needed to pass. Although that should have ended the controversy, it actually heightened the Defendants' interest in punishing Mr. Davison for his public opposition. The Defendants knew that Town administrators and Department supervisors would come back to the Town with a revised Public Safety Complex and they did not want a repeat of Mr. Davison's opposition.

42. Following the defeat of Public Safety Complex and Mr. Davison's inquiry to the State Ethics Commission, both protected First Amendment activities, the Town retained a private investigator to prove what Mr. Davison had never sought to hide: that he owned part of CC BioFuels and that he continued to perform administrative oversight for the CC BioFuels whether he was working or on Chapter 41 Leave. The Defendants' concerted action against Mr. Davison for his exercise of his First Amendment rights was so pre-determined that in the Fall of 2013, Mr. Davison's ex-wife contacted him and was able to taunt him that she knew he was going to be fired.

43. In 2013, Defendant Viveiros was accused of hacking into various firefighters' personal email accounts and using their private emails to expose whether they had been in contact with Town politicians. The Town began an investigation and the investigator

interviewed various firefighters, including Mr. Davison. Submitting to such an interview was a protected, First Amendment activity. The investigator determined that Defendant Viveiros had engaged in such hacking, probably in violation of law. Defendant Viveiros, however, was a "favored" firefighter and part of the conspiracy, so he received no meaningful punishment. Ultimately, the investigation and report was just a way to sweep Defendant Viveiros's misconduct under the rug.

44.     Such favored treatment by Defendants Corriveau and Russell only emboldened Defendant Viveiros, who blamed Mr. Davison for the sign and for the investigation. At a later union meeting, Defendant Viveiros threatened Mr. Davison with a baseball bat, which he brandished in a menacing manner. This was just another example of Defendants' coercion, intimidation, and retaliation against firefighters who did not agree with them.

45.     In the meantime, Defendants Viveiros and Corriveau, pursuant to instructions, began to show up at CC BioFuels asking to meet with and see Mr. Davison. Simultaneously, the Town retained a private investigator to photograph Mr. Davison around town and at CC BioFuels. On information and belief, the Town had never previously followed any of its firefighters on Chapter 41 Leave. While the Town was following Mr. Davison around, other favored firefighters on leave were working at other jobs with impunity. Indeed, texts among the Department supervisors reflect that they were warning other firefighters about when and how to fly below the radar.

<u>Termination of Davison's Employment</u>

46.     In December, 2013, the Town formally began proceedings to terminate Mr. Davison while he was still out on Chapter 41 Leave. The Town terminated Mr. Davison in April, 2014, ostensibly for publicly promoting the environmental mission of CC BioFuels and

performing administrative tasks as an owner of CC BioFuels. The action was, in fact, intended to punish Mr. Davison for his public opposition to the grandiose Public Safety Complex.

## COUNT I

### Violation of 42 U.S.C. §1983

47. Plaintiffs reallege all of the matters set forth in paragraphs 1-46 as though fully set forth herein.

48. The First Amendment of the United States Constitution grants the rights of free speech, free press, and to petition the government. Mr. Davison exercised those rights and was punished by the Defendants acting under color of law and supposedly pursuant to state statute and Town rule, policy, custom, practice and usage. CC BioFuels also exercised its rights and the Defendants, acting under the color of law, punished Mr. Davison for CC BioFuels' exercise of those rights.

49. When Mr. Davison, on behalf of himself and CC BioFuels, objected to being treated differently, he was further retaliated against.

50. Accordingly, the Defendants, separately and together, have knowingly and consciously violated Mr. Davison's and CC BioFuel's rights in contravention of 42 U.S.C. §1983.

## COUNT II

### Violation of M.G.L. c.12 §§11H and 11I

51. Mr. Davison realleges all of the matters set forth in paragraphs 1-50 as though fully set forth herein.

52. The First Amendment of the United States Constitution and cognate provisions of the Declaration of Rights of the Massachusetts Constitution grant the rights of free speech, free

press, and to petition the government. State law further grants to Mr. Davison the right to be paid on Chapter 41 Leave after being injured on the job. Mr. Davison exercised those rights and the Defendants, separately and together, interfered with his exercise of those rights by threats, intimidation, and coercion and they attempted to do so, as well.

53. Such conduct violates M.G.L. c.12, §§11H & 11I. Each of the Defendants, acting separately and together, has consciously and deliberately violated Mr. Davison's rights in contravention of M.G.L. c.12, §§11H & 11I.

COUNT III

Violation of M.G.L. c.41

54. Mr. Davison realleges all of the matters set forth in paragraphs 1-53 as though fully set forth herein.

55. Section 111F of Chapter 41 of the Massachusetts General Laws establishes the Commonwealth's basic system for compensating injured firefighters and other first responders. The Commonwealth permits local towns to adopt or reject the Chapter 41 system of providing for injured firefighters if they choose to do so within the context of the town's collective bargaining agreements with the affected town employees. Rather than reject the Chapter 41 system, the past and present collective bargaining agreements between the Town and its firefighters affirmatively <u>adopts</u> the Chapter 41 system. In addition, the collective bargaining agreement between the Town and its firefighters voids any rule adopted by the Department which varies from the collective bargaining agreement.

56. The Chapter 41 system of compensating injured firefighters does not require that they cease outside employment in order to receive Chapter 41 benefits and that is made plain in that and related statutes. <u>See</u> <u>also</u> M.G.L. c.32, §85H. Because the collective bargaining

agreements between the Town and its firefighters affirmatively adopts the Chapter 41 system in toto, the Department's purported rule, which has only been enforced as to Mr. Davison, contravenes Chapter 41 and the collective bargaining agreement and is therefore unenforceable. Nonetheless the Town purported to rely on this unenforced and generally unenforceable rule to punish Mr. Davison.

57. Accordingly, Mr. Davison is entitled to declaratory and injunctive relief, as well as damages, for the Town's violation of the Chapter 41 system.

## COUNT IV

### Civil Conspiracy

58. Mr. Davison and CC BioFuels reallege all of the matters set forth in paragraphs 1-57 as though fully set forth herein.

59. The individual Defendants did engage in a civil conspiracy in violation of law to accomplish, by acting together, what they could not have accomplished individually in the deprivation of Mr. Davison and CC BioFuels's rights and to punish them for their exercise of those rights. This civil conspiracy has injured and damaged Plaintiffs.

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs Andrew Davison and Cape Cod BioFuels respectfully pray that this Court grant them the following relief:

1. That the Court enter such preliminary and permanent injunctive relief as is warranted;

2. That judgment enter for the Plaintiffs on their claims against the Defendants for their damages, interest, costs, and attorney's fees;

3. That the Court grant the Plaintiffs such declaratory and other or further relief as it considers just and proper.

JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

ANDREW DAVISON

CAPE COD BIOFUELS, INC.

By their attorneys,

/s/ Richard J. Yurko
Richard J. Yurko (BBO# 538300)
Douglas W. Salvesen (BBO# 550322)
Noemi A. Kawamoto (BBO# 676870)
YURKO, SALVESEN & REMZ, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108
(617) 723-6900

Dated: May 21, 2015