# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                             )
**ANDREW DAVISON and CAPE COD**    )
**BIOFUELS, INC.,**                     )
                             )
       **Plaintiffs,**             )
                             )     **Civil Action No.**
       **v.**                    )     **15-11889-FDS**
                             )
**TOWN OF SANDWICH, JASON VIVEIROS,** )
**THOMAS CORRIVEAU, GEORGE**    )
**RUSSELL, and GEORGE H. DUNHAM,**  )
                             )
       **Defendants.**           )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil action brought by a former firefighter (and a company that he owns and operates) for alleged violations of his constitutional rights and for various state-law claims. Plaintiffs Andrew Davison and Cape Cod BioFuels, Inc., have filed suit against the Town of Sandwich; George H. Dunham, the Sandwich Town Manager; George Russell, the former Fire Chief; Thomas Corriveau, the former Deputy Fire Chief; and Jason Viveiros, a lieutenant in the Fire Department.

In November 2011, Davison injured his shoulder in the line of duty and took an extended injury leave. While on leave, he received his full salary and benefits. He also performed work for his company, Cape Cod BioFuels, Inc., during the leave. Among other things, he promoted the company and appeared in multiple news stories about it while on injury leave.

Beginning in July 2012, Davison put up a sign on his property urging town residents to

"vote 'no'" on a proposed new public safety complex.  Town officials, who supported the complex, were unhappy with the sign.  Nonetheless, Davison was not ordered to take it down.  The proposal was defeated at a town meeting in May 2013.

The Town of Sandwich Fire Department has a rule that prohibits employees from performing work of any kind while on injury leave.  Town officials requested that Davison stop working while on leave, which he refused to do.  He also provided incomplete and untimely medical information in response to requests from the town for more information about his claimed disability.  Davison was reprimanded for violating the rule in September 2012.  Nonetheless, he continued to work for his company while on injury leave.  The town hired an investigator to follow Davison, who observed him working at the company, lifting large objects, and moving without any discomfort or restriction.  Eventually, in April 2014, Davison was fired for violation of town rules and policies and insubordination, as well as making a threatening telephone call.

Davison now contends, in substance, that he was fired in retaliation for putting up the sign, in violation of his exercise of his First Amendment rights of free speech.  All defendants have moved for summary judgment as to all claims.  For the following reasons, the motion will be granted in part and denied in part.

## I.   Background

### A.   Factual Background

#### 1.   Plaintiffs

Andrew Davison was hired as a full-time professional firefighter in the town of Sandwich, Massachusetts, in 2002.  (Davison Dep. at 19).  He is also a resident of Sandwich.  (Def. Ex. 8 at 54).

In 2007, Davison co-founded a company called Cape Cod BioFuels, Inc., that manufactures biodiesel from cooking oil. (Davison Dep. at 29-30). He owns fifty percent of the company, and serves as both its secretary and the chairman of its board. (*Id.*). In those capacities, he performs various administrative and sometimes physical tasks for the company, and is responsible for overseeing day-to-day operations. (Davison Aff. ¶ 5).

### 2.   Defendants

The Town of Sandwich is a Massachusetts town, with a town meeting form of government. George H. Dunham is the Town Manager. (Def. SMF ¶ 6).

George Russell was the Fire Chief of Sandwich until his retirement in January 2014. (Russell Dep. at 12). Thomas Corriveau was the Deputy Fire Chief until his retirement in June 2014. (Corriveau Dep. At 8). Jason Viveiros is a lieutenant in the fire department and serves as the local president of the firefighters' union. (Def. SMF ¶ 2).

### 3.   Fire Department Rules and CBA

Mass. Gen. Laws ch. 41, § 111F governs leave with pay for injured firefighters. It states, in substance, that firefighters injured in the line of duty shall be granted leave without loss of pay for the period of their incapacitation. Mass. Gen. Laws. ch. 41, § 111F.

Rule 22.5 of the Sandwich Fire Department's Rules and Regulations prohibits firefighters who are receiving full pay while on § 111F leave from working "at any other job whether paid or not paid." (Def. Ex. 5).

All full-time Sandwich firefighters, except the Chief and Deputy Chief, are required to join the firefighters' union. (Pl. SMF ¶ 49). The employment of all union members is governed by a collective bargaining agreement negotiated between the union and the town. (*Id.*). Article IV, § 2 of the relevant agreement states that the town's Board of Selectmen shall "promulgate

reasonable rules and regulations pertaining to the operation of the Fire Department and the conduct of employees." (Pl. Ex. 8 at 5). However, Article II, § 2(D) of the agreement states that its provisions "shall supersede any conflicting Town Bylaw, rule or regulation to the extent permitted by Chapter 150E of the General Laws." (*Id.* at 3). Article XXV of the agreement sets out the grievance procedures to be used "to settle all alleged grievances of members of the Department." (*Id.* at 21). It states that any grievance concerning an alleged violation of the agreement shall be presented first to the Fire Chief, then to the Town Manager, then to the Board of Selectmen and, if still not resolved, the union may then submit the matter for arbitration. (*Id.* at 21-22).

Article IX of the collective bargaining agreement between the firefighters' union and the town includes a provision that is virtually identical to Mass. Gen. Laws ch. 41, § 111F, and states that it is "intended to conform with the provisions of Section 111F." (Pl. Ex. 8 at 11).

### 4. **Davison's Injury**

On November 2, 2011, Davison injured his right shoulder in the line of duty while lifting an elderly man into an ambulance. (Davison Dep. at 80). He was granted injury leave two days later, on November 4. (Def. SMF ¶ 12). It is undisputed that he received full compensation and benefits during his periods of injury leave.

While on leave, Davison continued to work for Cape Cod BioFuels. He contends that the work was necessary to keep the business going. (Davison Aff. ¶ 6).

In early 2012, Davison stopped by the fire station to drop off a note from his doctor regarding the status of his injury, as is required for employees on injury leave. (Davison Aff. ¶ 6). According to Davison, Deputy Chief Corriveau, after inquiring about the status of his injury, asked how things were "at the shop"—which Davison interpreted to mean Cape Cod BioFuels—

and asked if he was able to keep things running with the injury.  (*Id.*).  Davison responded that

the business was running just fine, as others were able to do any physical work that needed to be

done, and he was only doing paperwork.  (*Id.*).  At that time, according to Davison, Corriveau

did not raise any objection to Davison's involvement with Cape Cod BioFuels while on injury

leave.  (*Id.*).

### 5. The News Articles about Cape Cod BioFuels

While still on leave, Davison hired a public relations firm to help promote Cape Cod

BioFuels.  (Davison Dep. at 118).  The firm set up interviews for Davison with various local

newspapers and magazines.  (*Id.*).  As a result, in the summer of 2012, a series of articles were

published about Cape Cod BioFuels featuring statements by Davison about his involvement with

the company.  (Def. Ex. 8 at 10-22).[1]  Two of the articles included photographs of what appeared

to be Davison wearing a Cape Cod BioFuels uniform and standing in front of a company truck.

(*Id.* at 13, 17).  As noted, at the time, Davison was on leave arising out of his ostensible inability

to work.

### 6. Davison's Sign Opposing a New Public Safety Complex

The Town of Sandwich had been working for several years on plans for a new joint fire

and police station, commonly referred to as the public safety complex, to replace its small and

outdated facilities.  (Dunham Dep. at 34-37, 46-47).  It was estimated that the project would cost

approximately $30 million.  (*Id.* at 50).  According to Davison, on July 4, 2012, the town

circulated pamphlets with information about its plan for the new complex.  (Davison Dep. at

177-78).  That was, according to him, when he first learned of the plan.  (*Id.*).

---

[1] The articles included stories published in the Patriot Ledger (July 25, 2012), Cape Cod Enterprise (July 27, 2012), capecodonline.com (July 31, 2012), and Cape & Plymouth Business Magazine (August 2012).  (Def. Ex. 8 at 2-3).

At the end of July 2012, after learning about the proposed project, Davison put up a large sign in his front yard that read "Vote No Public Safety Complex." (Davison Dep. at 159, 175, 178).[2]  Davison's home was located on a busy road that defendants Russell and Corriveau drove down regularly. (Dunham Dep. at 160; Russell Dep. at 160; Corriveau Dep. at 78).  According to Davison, the sign remained up, with occasional breaks, between July 2012 and December 2012, and again in the spring of 2013. (Davison Dep. at 147-49, 178-79, 218).[3]

### 7.    **Events of July and August 2012**

Sometime in July 2012, Jason Viveiros—a lieutenant in the fire department and president of the firefighters' union—called Davison.  According to Davison, Viveiros was "screaming" at him to take down the sign. (Davison Dep. at 101-02).  Also according to Davison, Viveiros told him that unless he took down the sign, his job and chances of receiving a promotion could be in jeopardy. (*Id.* at 103).

On August 3, 2012, Davison again went to the fire station to drop off a note concerning his medical condition. (Davison Dep. at 99-100).  The note, which was from Cape Cod Orthopaedics and Sports Medicine, was dated August 2, 2012.  It stated:  "[R]emain out of work until further notice.  Daily non-physical activity is not impeding his return to work at Sandwich Fire Department." (Def. Ex. 8 at 25).

While at the fire station, Deputy Corriveau spoke to Davison.  Corriveau's description of the meeting, which he memorialized on August 7, was as follows:

> I had a conversation with [Davison] concerning recent published articles detailing the company in which he has partial ownership.  . . .

---

[2] According to Davison, he put up the sign in his personal capacity; his company, Cape Cod BioFuels, had nothing to do with the sign. (Cape Cod BioFuels Dep. at 32).

[3] Two other firefighters testified that they recalled seeing the sign up in July or August 2012. (Maciel Dep. at 22-23; LeVangie Dep. at 9).

> He had already heard that I was upset about the recent stories prior to the start of our conversation.  I told him that the articles describing how well his business was doing were inappropriate as he was on injury leave.  He told me he was a partner in a business and he has every right to speak to the media concerning its operation.  He went as far as to say they had hired a public relations firm to further their interests.
>
> FF Davison had no remorse or felt any responsibility in [*sic*] this inappropriate behavior.  He stated that there had been a previous case in which someone taught a CPR class while out on injury and he had every right to run his company while out.  . . .
>
> I tried to convey that recent changes in the public pension retirement system were the direct result of actions similar to the one of which we were speaking of.  His reply was that he does not care as "he will not be here much longer."
>
> On leaving my office he stated "you will be seeing me on WCVB's Chronicle TV program["] as they had videoed a story on his business.  His arrogant sense of entitlement that was shown [*sic*] was remarkable.

(Def. Ex. 8 at 23).

According to Davison, Deputy Corriveau told him during the meeting "it would behoove [him] to keep [his] mouth shut."  (Davison Dep. at 113).  Also according to Davison, Corriveau mentioned that the town was not happy with his sign, and that if he "continued on such a path" it would hurt his chances of receiving a promotion and he would be "scrutinized going forward." (*Id.* at 100).  Corriveau denies making any such statements, and contends that he did not even become aware of Davison's sign until November 2012.  (Corriveau Dep. at 98-99).

Later in the day on August 3, 2012, Chief Russell gave a letter to Davison stating the following:

> This letter is to notify you that you are in violation of Article 22 Section 5 entitled "Sickness and Line of Duty Injuries" in the current Department Rules and Regulations dated December 5, 1991.  Article 22 Section 5 states "Members on sick or injured leave shall not work any other job whether paid or not paid."
>
> It has become public knowledge that you are violated this specific section of the Rules and Regulations.  You are hereby ordered to immediately cease any further activity that would violate the Department Rules and Regulations.

Any further violations of the Department Rules and regulations will lead to disciplinary action including but not limited to suspension and/or termination.

(Def. Ex. 8 at 24).[4]

On August 15, 2012, Chief Russell sent another letter to Davison.  That letter recounted Davison's August 3 meeting with Deputy Corriveau and stated that "[t]he events of August 3, 2012 are troubling for a number of reasons and require immediate action on your part."  (Def. Ex. 8 at 25).  The letter continued:

. . . I hereby order you to immediately cease and desist from any employment activities during any remaining period of leave of absence pursuant to Chapter 41. As you know, such employment is expressly prohibited by Rule 22.5 of the Sandwich Fire Department Rules and Regulations.  Rule 22.5 states the following:  "Members on sick or injured leave shall not work at any other job whether paid or not."  Accordingly, to the extent that you have been employed by any company for the period of November 02, 2011 through the present, you have been in violation of this Department's Rules and Regulations and you must immediately terminate any conduct which continues to violate Rule 22.5.

(Def. Ex. 8 at 26).  The letter went on to state that "the August 02, 2012 note from your medical provider does not sufficiently address your current physical condition as it relates to your ability to return to your employment responsibilities with the Town of Sandwich," and in particular it did not "address the critical question of what condition, if any, currently prevents your return to work" and provided "no detail regarding an anticipated return to work date."  (*Id.*).  It requested an appropriate medical note within seven days.  (*Id.*).[5]

Davison then sent a copy of Chief Russell's August 15 letter to Viveiros, the union president.  (Davison Dep. at 321).  Viveiros forwarded the letter to the union's attorney, Howard

---

[4] According to Russell, Davison responded, "You can't stop me from working and putting food on my table, and you're violating the Interstate Commerce Act [sic]."  (Russell Dep. at 112).

[5] The letter also advised Davison that "the Town is obligated to investigate whether your activities during the term of your leave of absence constitutes a violation of Department Rules and Regulations and whether any such activities have resulted in the wrongful receipt and/or misappropriation of benefits by you," and that the town was reserving its rights as to "the payment of any additional benefits to you."  (*Id.*).

Lenow.  (*Id.* at 324).  Davison later met with Viveiros and Lenow and expressed his belief that he was being singled out for enforcement of Rule 22.5 because of his position on the public safety complex.  (*Id.* at 328-29).  Lenow responded that there was nothing that the union could do for Davison until the town formally disciplined him.  (*Id.* at 329).

On August 20, Deputy Corriveau interviewed Davison as part of his investigation.  (Def. Ex. 8 at 27; Davison Dep. at 131).  Corriveau asked Davison about his work for Cape Cod BioFuels while on injury leave.  (Davison Dep. at 132).  Davison responded that he had performed a number of administrative tasks for the company, but denied doing any physical labor while on leave.  (Def. Ex. 8 at 27).

On August 24, 2012, Davison provided a note to the fire department from Dr. Thomas Kinkead at Cape Cod Orthopedics and Sports Medicine.  The note stated that due to a continuing deficit in strength and the need for additional physical therapy, Davison could not be evaluated for a return to work until a subsequent office visit in three and a half weeks.  (Def. Ex. 8 at 29).

### 8.   Davison's Return to Work and the Events of September 2012

On August 29, Davison's doctor provided a note that cleared him to return to work without restrictions on September 4, 2012.  (Def. Ex. 8 at 30).  Around that same time, Corriveau completed his investigation and sent a report of his findings to Chief Russell.  (Def. Ex. 8 at 31). Davison returned to work on September 4.  (*Id.* at 5).

On September 27, 2012, Russell sent a letter to Davison.  (*Id.* at 5, 36-37).[6]  The letter stated that Davison's work for Cape Cod BioFuels, which had been documented in newspaper and online reports, created a "direct conflict with Rule 22.5 of the Sandwich Fire Department Rules and Regulations."  (*Id.* at 37).  The letter further stated that it "constitute[d] a written

---

[6] The letter itself is undated.  (Def. Ex. 8 at 36-37).

reprimand for a direct violation of Department Rules and Regulations." (*Id.*).

Davison sent a copy of Russell's reprimand letter to Viveiros, who said he would talk to attorney Lenow about it. (Davison Dep. at 331-32). Viveiros later told Davison that, according to Lenow, the letter could not be the basis of a grievance. (*Id.* at 332).

On September 28, 2012, Chief Russell issued a memorandum to all Sandwich firefighters. The memorandum stated that its purpose was "to reinforce that the Town of Sandwich Fire Department continues to strictly enforce and expects compliance by all members of the Department" with all department rules and regulations. (Def. Ex. 8 at 38). It specifically "highlight[ed]"Rule 22.5. (*Id.*). Among other things, it stated that "Rule 22.5 prohibits any employment by any member of the Department during the period of any leave of absence for sickness or injury, regardless of whether such employment provides compensation and/or requires any form of physical labor or exertion." (*Id.*).

### 9.    Whether Rule 22.5 Had Been Enforced in the Past

It appears that Davison was the first Sandwich firefighter to be reprimanded for violating Rule 22.5. (Russell Dep. at 76). According to Chief Russell, the rule did not have to be enforced because it had never been violated. (*Id.* at 76-77). It appears that since September 2012, three firefighters other than Davison have been investigated or disciplined for violating the rule. (Dunham Dep. at 66-73; Russell Dep. at 70-73).

Another firefighter testified that prior to 2012 it was "common knowledge," despite the rule, that working while on injury leave was permissible as long as it did not aggravate injuries or prolong the period of leave. (Lahteine Dep. at 29). Three firefighters testified that they had engaged in non-physical work while out on leave and not been reprimanded. (Maciel Dep. at 37-40; Lahteine Dep. at 21-23; LeVangie Dep. at 19-20). According to those firefighters, Deputy

10

Corriveau knew of their outside work, but told them in substance that as long as their work was not physical and did not aggravate their injuries or otherwise prolong their absence, it was not a problem.  (Maciel Dep. at 37-40; Lahteine Dep. at 30; LeVangie Dep. at 19-20).

### 10.   Further Developments Concerning Davison's Sign

According to Chief Russell and Deputy Corriveau, they first became aware of Davison's sign in November 2012.  (Russell Dep. at 157-58; Corriveau Dep. at 98-99).  Russell saw the sign periodically when driving by, but testified that he "didn't care" and that the measure "wasn't going to pass anyway."  (Russell Dep. at 160-61).

On December 15, 2012, a news article was published in the Cape Cod Times about the sign.  (Def. Ex. 10).  The article described Davison as the first Sandwich firefighter to publicly demonstrate opposition to the public safety complex.  (*Id.*).[7]  It also quoted Town Manager Dunham as saying, "It's a freedom of speech thing, the way we look at it."  (*Id.*).[8]

Davison's sign was discussed at a December 2012 meeting of the public safety commission (the group in charge of planning the public safety complex).  (Russell Dep. at 163).  Assistant Town Manager Douglas Lapp asked if there was a way to order Davison to take down the sign.  (*Id.* 163-64).  The Building Inspector stated that there was nothing that could be done about the sign, as it complied with all town ordinances.  (*Id.* at 166).

Davison's sign was also discussed at union meetings.  (LeVangie Dep. at 12-14).  At one such meeting in the spring of 2013, Viveiros reported that the town was not happy about Davison's sign.  (*Id.* at 14-15).  He also said that the sign was being discussed during contract

---

[7] The article also noted that Davison owed $37,193 in back taxes and interest to the Town.  (Def. Ex. 10).  Davison disputes that contention, and alleges (without citation to any evidence) that a town official "fed" that information to the reporter.  (Def. SMF ¶ 23).

[8] Corriveau testified in his deposition that Davison had the "right [to] his personal opinion" and the "right to put the sign up."  (Corriveau Dep. at 100).

negotiations between the union and the town, and that the sign was detrimental to the union's bargaining power.  (Lahteine Dep. at 58-59).

### 11.  Davison's Second Disability Leave

Davison contends that in the months after his return to active duty in September 2012, he began to experience numbness in his arm and hand.  He contends that the numbness was related to either his original shoulder injury or the physical therapy he had received for that injury. (Davison Dep. at 60).

Davison went back on injury leave on March 26, 2013.  (*Id.* at 59; Def. Ex. 8 at 5).  He again received full pay and benefits while on leave.  (Def. Ex. 8 at 51).

On April 9, 2013, Davison provided the town with a note from his doctor stating that treatment for his condition would likely continue for four to six weeks.  (Def. Ex. 8 at 42). According to that timetable, he would return to work between May 8 and May 22, but in any event no later than May 22.

On April 26, 2013, an attorney representing Davison sent an e-mail to Chief Russell stating that he was seeking to "facilitate [Davison's] ability to manage the day-to-day affairs at [Cape Cod BioFuels] while he remains injured."  (Def. Ex. 8 at 39).  The letter stated that Davison was needed by the company for many "important," but non-physical, tasks, and sought a "clearer definition of the 'work' that [Davison] cannot perform while injured."  (*Id.*).

Davison did not return to work by May 22, 2013.  He did not provide any medical documentation for an extension of his leave beyond that date.  (*Id.*).  On May 30, Corriveau attempted to contact him to discuss his situation, but was unsuccessful.  (Def. Ex. 8 at 6).

### 12.  The Town Meeting Vote

The town's proposal for the new public safety complex was put to a vote at a town

meeting in May 2013.  (Dunham Dep. at 47).  The proposal did not receive the two-thirds

majority that it required to pass.  (*Id.*).

Shortly thereafter, according to Davison, Viveiros allegedly called him and told him that

it was his fault that the proposal failed, that it would be his fault if the union was not able to

negotiate a raise in their ongoing contract renegotiations, and that he would never get a

promotion and could lose his job.  (Davison Aff. ¶ 10).  Davison also contends that sometime

during the summer of 2013, Deputy Corriveau told him that "putting up [the] sign was a stupid

idea and that [he had] already been disciplined for it."  (Davison Dep. at 139).

### 13.    Events of June 2013

On June 10, 2013, Chief Russell called Davison and asked about his medical status and

his failure to provide the necessary medical documentation in support of his continued leave.

(Def. Ex. 8 at 42).  Among other things, Davison claimed that he had provided a note to

Corriveau concerning his medical status at some point after May 21, 2013.  (*Id.*).  Corriveau

denied that Davison ever did so.  (*Id.*).

Russell called Davison again on June 13, 2013.  (*Id.*).  Eventually, on June 14, 2013,

Davison provided a note from his doctor indicating that he would not be able to return to work

for another five weeks.  According to that timetable, Davison would be out of work until July 19,

2013.  (*Id.*).

On June 24, 2013, Chief Russell sent a letter to Davison reminding him of the "need to

provide complete and timely documentation" to the Fire Department, including "a specific

description of the condition(s) which incapacitates you from your firefighting responsibilities,

the present status of physical condition, your current and scheduled treatment plan, and the

anticipated duration of any additional medical leave."  The letter also asked for a copy of the

May 2013 medical note.  Finally, and in response to the inquiry from Davison's attorney, the letter reminded him that under Rule 22.5 he was not permitted to work while on leave.  (*Id.* at 42-43).

There is no evidence that Davison provided additional medical documentation in response to the June 24 letter.  He did not return to active duty.  (Pl. SMF ¶ 11).

### 14.     The Private Investigator's Report

In August 2013, Town Manager Dunham hired a private investigator to conduct surveillance on Davison to see if he was continuing to work for Cape Cod BioFuels while on leave.  (Dunham Dep. at 84).  After conducting surveillance during September and October, the investigator prepared a report.  (Def. Ex. 8 at 46-54).  The report indicated that Davison was, in fact, working for Cape Cod BioFuels.  Among other things, the report also stated as follows:

> While outside his workplace [on September 5], [Davison] walked up [to] a pickup truck, reached inside with both arms, and lifted out a large box believed to have contained oil which he carried out of view.
>
> . . .
>
> While conversing outside [on September 9], [Davison] lifted his right arm and appeared to wave.  At his home, he carried what appeared to be garbage bags in each of his hands.
>
> . . .
>
> While observing [Davison], he did not appear to be in any kind of physical pain or discomfort, nor did he show any signs of restriction of movement.

(*Id.* at 54).[9]

On October 23, 2013, the investigator observed Davison lifting garbage bags out of his pickup truck and throwing them into a dumpster.  (Def. Ex. 8 at 7).

---

[9] Davison contends that the box he was seen lifting was nearly empty.  (Davison Dep. at 157).

14

### 15.      **The December 13, 2013 Letter**

On December 13, 2013, Town Manager Dunham delivered a letter to Davison "to provide [him] with notice of [Dunham's] intention to discharge [him]" from the Sandwich Fire Department.  (Def. Ex. 8 at 2).  The letter was eight single-spaced pages long.  (*Id.*).  It stated that the reasons for Davison's termination included "violations of Sandwich Fire Department Rules and Regulations; violations of Town of Sandwich Personnel Policies and Procedures; violations of direct Orders of your Commanding Officers; conduct unbecoming a public employee; insubordination; and, other just cause."  (*Id.*).

The December 13 letter provided a lengthy summary of Davison's "conduct" and the "grounds for [his] discharge."  (*Id.*).  The letter listed the 2012 articles about Davison's involvement with Cape Cod BioFuels; stated that he had been warned that his conduct violated Rule 22.5 and that he had been ordered repeatedly to stop; and summarized the findings of the 2013 investigation.  (*Id.* at 2-8).  The letter concluded that Davison's "willful and repetitive conduct constitutes a clear and unambiguous violation of applicable provisions of Sandwich Fire Department Rules and Regulations . . . [and] constitutes insubordination and conduct unbecoming a public employee."  (*Id.* at 9).  The letter also reserved the right to supplement the grounds for Davison's discharge.  (*Id.* at 2).

Documentation supporting Dunham's decision was attached to the December 13 letter.  The attachments included, among other things, the July and August 2012 news articles about Cape Cod BioFuels, Chief Russell's August 2012 letter notifying Davison that he was in violation of Rule 22.5, Chief Russell's September 2012 written reprimand, and the results of the September and October 2013 investigation into Davison's employment-related conduct while on leave.  (Def. Ex. 8).

Notwithstanding the letter, Davison was not immediately terminated.  Instead, the letter

stated that a meeting had been scheduled for December 19, 2013, to discuss the discharge

decision.  (*Id.* at 8).  There is no evidence that the meeting took place.

### 16.    Events of January and February 2014

In January 2014, Davison reviewed the termination letter, along with its attachments,

with union attorney Lenow.  (Davison Dep. at 333).  According to Davison, when they reviewed

the September 2012 written reprimand, Lenow stated that he had never seen it before.  (*Id.* at

334).  Davison then became angry, and accused Viveiros of failing to represent him by falsely

stating that he had shown Lenow the reprimand letter.  (*Id.*).

Chief Russell retired in January 2014.  (Russell Dep. at 12).  On February 19, 2014,

Town Manager Dunham again wrote to Davison, supplementing his December 13 notice with a

summary of additional grounds for termination.  (Def. Ex 12).  According to that letter, Davison

had called Viveiros on January 29, 2014, and said:  "You f****d with wrong guy [sic].  I am

going to take everything from you."  (*Id.*).  The letter concluded that Davison's conduct had

"clearly intended to be threatening, harassing, and intimidating" and violated the Town of

Sandwich Personnel Policies and Procedures.  (*Id.*).

Davison does not deny making the threatening telephone call.  (Davison Dep. at 243).  He

says he made it because he was unhappy with the union representation he had received from

Viveiros.  (*Id.* at 244).

### 17.    The Termination of Davison's Employment

On April 2, 2014, Dunham again wrote to Davison stating that, for the reasons set forth in

the December 13 and February 19 notices, Dunham had decided to terminate Davison effective

April 4, 2014.  (Def. Ex. 13).  Dunham made the termination decision.  (Dunham Dep. at 81,

161).  According to Dunham, the other town personnel who participated in the decision "over the time this was being discussed" were Russell, Corriveau, human resources director Marie Buckner, and counsel Matt Tobin.  (*Id.* at 81).  Viveiros had no role in the decision.  (*Id.* at 161).

### 18.   Davison's Application for Disability Retirement

In December 2013, after receiving the notification of the town's intent to terminate him, Davison applied for accidental disability retirement.  (Davison Dep. at 73-74).  In July of 2014, a panel of three physicians from the Massachusetts Public Employee Retirement Administration Commission reviewed Davison's job description and medical record and concluded that he was physically incapable of performing the essential duties of his job and that his incapacity was likely to be permanent.  (Def. Ex. 14).  However, the panel also concluded that his incapacity was not a proximate result of an injury sustained during the course of his employment as a firefighter.  (*Id.*).

### B.   Procedural Background

Davison and Cape Cod BioFuels, Inc., filed the complaint in this action on May 21, 2015.  It alleges four counts:  violation of 42 U.S.C. § 1983 as to all defendants (Count One); violation of Mass. Gen. Laws ch. 12, §§ 11H and 11I as to all defendants (Count Two); violation of Mass. Gen. Laws ch. 41 as to the Town of Sandwich (Count Three); and civil conspiracy as to all defendants (Count Four).

Defendant Jason Viveiros has moved for summary judgment as to all counts against him (Counts One, Two, and Four).  Defendants Town of Sandwich, Thomas Corriveau, George Russell, and George Dunham have moved for summary judgment as to all counts.  For the reasons stated below, the motion of Viveiros will be granted, and the motion of the Town of Sandwich, Corriveau, Russell, and Dunham will be granted in part and denied in part.

17

## II.   Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

## III.   Analysis

### A.   First Amendment Retaliation

Count One alleges that all defendants unlawfully retaliated against plaintiffs for the exercise of their First Amendment rights.  It appears to contain two separate claims:  (1) that defendants violated Davison's First Amendment rights by impermissibly retaliating against him and (2) that defendants violated the free-speech rights of Cape Cod BioFuels by retaliating against Davison.  (Compl. ¶ 48-50).

The Court will first analyze the claim asserted by Davison.   As to his claim, different tests apply to those with the authority to take employment action (here, Dunham, Russell, and Corriveau) and others (here, Viveiros).  *See Trant v. Oklahoma*, 754 F.3d 1158, 1169 (10th Cir. 2014).[10]  Furthermore, under *Monell v. Department of Social Servs. of City of N.Y.*, 436 U.S. 658 (1978), the town may not be held vicariously liable for the torts of its employees or agents and thus can only be liable to the extent that it caused an injury directly.

### 1.      Claim of Davison against Dunham, Russell, and Corriveau

As a government employee, Davison's right of free speech is not the same as that of an ordinary citizen.  That is because "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public."  *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).  To prove a claim of First Amendment retaliation as a public employee, Davison must establish (1) that he "spoke as a citizen on a matter of public concern"; (2) that his interest, "as a citizen, in commenting upon matters of concern" outweighs the government's interest "as an employer, in promoting the efficiency of the public services it performs through its employees"; and (3) that the protected speech was a "substantial or motivating factor in the adverse action against the plaintiff." *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (internal quotation marks omitted).

It appears undisputed that Davison has satisfied the first two elements.  Defendants do dispute that Davison's sign constituted speech undertaken in his role as a citizen, and that his interest in commenting on a matter of public concern outweighed any countervailing interest of

---

[10] It is undisputed that Viveiros did not have the authority to terminate or otherwise officially reprimand Davison.  (Pl. Opp. Mem. at 2).

the town.  The issue is thus whether he has shown that his protected speech was a "'substantial or motivating factor in the adverse employment decision.'"  *Id.* at 106 (quoting *Mt. Healthy Cty Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).[11]  Here, there are two adverse employment decisions at issue:  Davison's reprimand in September 2012 and his ultimate termination in April 2014.

Causation is analyzed by means of a two-step inquiry.  "First, the plaintiff must show that the employer would not have taken adverse action but for the plaintiff's speech."  *Id.*  If the plaintiff meets that burden, by means of either direct or circumstantial evidence, the burden shifts to the employer to establish that it would have taken the adverse action even without the protected speech.  *Id.*  The initial burden on the plaintiff is "more substantial than the burden of producing prima facie evidence in, for example, the first stage of a Title VII discrimination case. The employee must produce sufficient evidence of motivation at the initial stage such that the *burden of persuasion itself passes to the defendant-employer*."  *Diaz-Bigio v. Santini*, 652 F.3d 45, 51 n.3 (1st Cir. 2011) (internal citations and quotation marks omitted) (emphasis in original).

### a.    Whether Plaintiff Has Produced Evidence of Causation

There is little direct evidence that Davison's protected speech (that is, putting up the sign) caused any adverse employment action.  The only evidence as to Town Manager Dunham's opinion of the sign was that it was "a freedom of speech thing, the way we look at it." (Def. Ex.

---

[11] In the context of a First Amendment retaliation claim, the standard for what constitutes an "adverse employment action" is relatively lenient.  *See Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).  Unlike in the Title VII context, an "adverse employment action" in the First Amendment context need not materially alter the terms or conditions of employment.  *Id.*  Rather, an employer's act constitutes an "adverse employment action" if it "places substantial pressure on the employee's political views" or would "have a chilling effect on the employee's exercise of First Amendment rights."  *Id.*  Thus, even relatively minor events such as reprimands can constitute "adverse employment actions."  *Id.* at 29-30.  As discussed below, however, a plaintiff in such a case may be limited to the recovery of nominal damages if no actual, provable injury resulted.

10).[12]  There is no evidence that Chief Russell had a view one way or the other about the sign.

Finally, according to Davison, Deputy Chief Corriveau told him that putting up the sign had been

a stupid idea, and would hurt his chances of promotion.[13]  Corriveau apparently had some

involvement in the eventual termination decision, but it is unclear to what extent.[14]

Davison's retaliation argument thus turns in large part on circumstantial evidence:  in

particular, the temporal relationship between the sign controversy and the events leading up to

his termination.  Temporal proximity between protected speech and adverse employment actions

can be circumstantial evidence of causation.  *See Nethersole v. Bulger*, 287 F.3d 15, 20 (1st Cir.

2002).

Viewing the evidence in the light most favorable to Davison, the basic sequence is that

Davison went out on injury leave in November 2011; Davison put up the sign in July 2012;

Corriveau expressed concern about his outside work, and Russell ordered him to stop working at

Cape Cod BioFuels, in August 2012; Davison returned to work in early September 2012; and

Russell formally reprimanded him for violating Rule 22.5 in late September 2012.  Davison then

went back on injury leave in March 2013, continued to perform work in violation of Rule 22.5,

and was eventually terminated in April 2014.

Under the circumstances, the evidence (particularly the temporal proximity of the

relevant events) is sufficient to satisfy the standard.  Specifically, Davison has succeeded in

---

[12] There is evidence that the Deputy Town Manager, Douglass Lapp, asked in December 2012 if Davison could be ordered to take the sign down, and the Building Inspector responded that there was nothing that could be done.  Lapp, however, is not a defendant, and there is no evidence that he participated in or influenced the termination decision.

[13] As noted, Corriveau testified in his deposition that Davison had a right to his opinion and a right to put up the sign.

[14] According to Davison, Lieutenant Viveiros was angry about the sign, and told him he could lose his job.  Viveiros, however, was only a lieutenant, and there is no evidence that he made the decision to terminate Davison or had any influence on those who did.

putting forth sufficient proof to establish a causal relationship between the protected activity and the adverse employment actions:  that is, that the speech was at least a substantial or motivating factor in the decision to reprimand Davison and, ultimately, to terminate him.  The burden therefore shifts to the defendants to show that they would have taken the same action even in the absence of the protected conduct.

### b. Whether Defendants Would Have Taken the Same Action Regardless

As noted, there are two adverse employment actions at issue in this case:  the reprimand of Davison by Chief Russell in September 2012 and his termination by Town Manager Dunham in April 2014.  Both actions were based, to a very substantial degree, on the town's enforcement of Rule 22.5 against Davison, which he contends was retaliatory and unfair.  The Court will address that issue first, and then turn to the reprimand and termination decisions.

### (1) The Enforcement of Rule 22.5 against Davison

Davison does not dispute that he worked for Cape Cod BioFuels while on injury leave, and that his outside work violated the express terms of Rule 22.5.  He contends, however, that Rule 22.5 had not been enforced in the past by the town against other firefighters, and that therefore the enforcement of the rule against him was retaliatory, in response to his protected speech.

Viewed in the light most favorable to Davison, there is evidence that Rule 22.5 had not been enforced in the past against other firefighters; that Corriveau had previously advised two firefighters that they could perform outside work as long as it did not involve physical activity and did not aggravate or prolong their injuries; that Davison apparently believed that another firefighter had taught a CPR class while out on disability; that Davison had told Corriveau in early 2012 (before the sign was put up) that he was only doing paperwork at Cape Cod BioFuels

and that others at the company were doing any necessary physical work; and that Corriveau did not at that point seek to enforce the rule against Davison.

Even assuming the truth of that evidence, there is considerable doubt whether Davison was similarly situated to other firefighters against whom the rule was allegedly not enforced.  It is undisputed that Davison in fact engaged in physical activities, as the investigator observed and as the news articles reflected.  He was not simply sitting at a desk, attending to paperwork.  And he was on a very prolonged leave (actually, two periods of leave), with relatively scanty supporting medical documentation.  There is no evidence that any other town firefighter engaged in a similar type of outside employment, with a similar claimed disability, with a similar lack of supporting evidence of that disability.

Davison's circumstances are also substantially different because of the considerable publicity and attention given to his outside work.  His moonlighting activities were very high profile:  indeed, he hired a public relations firm to promote those activities.  That, in turn, created a very substantial possibility that the town would be ridiculed or embarrassed by his performance of work while on leave for a purported injury.[15]  Any municipality has a strong interest in preserving both the integrity of its employees and the public perception of that integrity.  If a firefighter is purportedly injured to the extent that he can no longer perform work, and is receiving full pay and benefits while on injury leave, it is perfectly appropriate for the town to insist that he perform no other work during his leave.  At a minimum, permitting such work promotes cynicism about public employees and undermines public confidence in town

---

[15] In his memorandum concerning his August 3, 2012 meeting with Davison, Corriveau stated that he "tried to convey that recent changes in the public pension retirement system were the direct result of actions similar to the one of which we were speaking . . . ."  (Def. Ex. 8 at 23).  Presumably, Corriveau was referring to the Pension Reform Act, Chapter 176 of the Acts of 2011, and to the publicity concerning abusive practices that led in part to the reform.  *See, e.g.,* Michael Levenson, *Pay as They Go: Law That Lets Retired Lawmakers Boost Their Pension Sparks Outrage*," The Boston Globe, Jan. 11, 2009.

government.

Even if the policy may have been enforced erratically, or inconsistently, by itself that is not remarkable.  Virtually all rules and regulations are enforced unevenly.  The town was entitled to pick its spots, or respond to a high-profile situation with a stricter approach, as long as its motive was not to retaliate for free speech activities.

In short, there is a substantial question whether Davison can actually establish that Rule 22.5 was, in fact, enforced differently as to him, as opposed to other firefighters who may have been differently situated.  Nonetheless, it appears that there is a material issue of disputed fact as to whether that is true.  The Court will therefore assume, for purposes of summary judgment, that Rule 22.5 had not been enforced against other firefighters in the past and that Davison was in fact similarly situated to those other firefighters.

### (2)      The September 2012 Reprimand

The combination of the temporal proximity between the display of the sign (which began in July 2012) and the reprimand (which occurred in late September 2012, after discussions beginning in August), plus the assumption that Rule 22.5 had not been enforced in the past against other similarly-situated firefighters, precludes the entry of summary judgment as to defendants Russell and Corriveau.  More precisely, there is a disputed issue of material fact as to whether defendants would have reprimanded Davison in September 2012 for violating Rule 22.5 even absent his free-speech activities.  Therefore, summary judgment will be denied as to defendants Russell and Corriveau on the claim of Davison for unlawful retaliation in violation of the First Amendment to the extent that that claim is premised on the September 2012 reprimand letter.[16]

---

[16] There is considerable doubt whether Davison suffered any concrete injury arising from the reprimand; it appears that he was not docked any pay or benefits, or denied any promotion, as a result.  Moreover, defendants

There is, however, no evidence that Town Manager Dunham played any role in the reprimand. The reprimand letter itself came from Chief Russell, and the contentious interactions that led up to the letter had been between Davison and Deputy Chief Corriveau. Indeed, the only evidence concerning Dunham's involvement prior to September 2012 was his statement to the press that Davison had a First Amendment right to put up the sign. Summary judgment will therefore be granted for Dunham as to any claim under Count One arising out of the reprimand letter.

### (3)   The April 2014 Termination

The termination of Davison, which occurred more than a year and a half after the reprimand, presents a different set of issues. Whether the town unfairly enforced Rule 22.5 for a *past* violation does not answer the question whether it did so for *ongoing and repeated* violations, in defiance of the direct orders of his superiors.

Davison was terminated, according to the town, for multiple reasons, including (1) his continued work for Cape Cod BioFuels in violation of Rule 22.5, (2) insubordination, and (3) (after January 2014) making a threatening communication to Viveiros. While some of the relevant facts are disputed, others are not.

First, and as noted, Davison does not dispute that he worked for Cape Cod BioFuels while on injury leave.

Second, and as also noted, he does not dispute that his outside work violated the express

---

have established that they would have terminated his employment regardless, even assuming a constitutional violation, as set forth below. Davison's recovery, if he prevails, may therefore be limited to nominal damages (although of course he may be entitled to attorney's fees). *See Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308-10 & n.11 (1986) (holding that "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages" and noting that nominal damages "are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury"); *Allah v. Al-Hafeez*, 226 F.3d 247, 251 (3d Cir. 2000) (collecting cases and noting that federal courts consistently award nominal damages for violations of First Amendment rights). That question, however, is not presented in the current motions.

terms of Rule 22.5.

Third, he does not dispute that he continued to work at the company despite repeated warnings and orders to stop doing so, including a formal reprimand.

Fourth, he does not dispute that he was observed by an investigator lifting large objects, and moving without apparent discomfort or restriction, during the time he was on injury leave.

Fifth, he does not dispute that he made the threatening telephone call to Viveiros, or that the call violated town policy concerning threats, intimidation, or harassment.

As noted, Davison put up his sign in July 2012, and was reprimanded for violating Rule 22.5 in September 2012.  He then continued to work at the fire department, and went back on injury leave in March 2013.  And when he did so, he continued to work at Cape Cod BioFuels, in violation of Rule 22.5.  He did so openly and defiantly, and gave no indication he had any intention of changing his behavior.  Davison apparently took the view—which he continues to assert today—that Rule 22.5 cannot be enforced against him under any circumstances whatsoever.  Put simply, Davison contends that he is effectively immunized from any consequence of his conduct, now and forever, because any consequence is necessarily retaliatory.

The basic problem is that Davison conflates his initial behavior (and the initial response of the town) with his later behavior (and the later response).  Even assuming that the town's initial attempt to enforce the rule was motivated by retaliation, it does not follow that the town could never enforce the rule, or that Davison could continue to defy it.

It is important to recognize that nothing in Rule 22.5 is illegal or unconstitutional. Davison was not being required by the rule to engage in illegal or unethical conduct.  Nor was he prohibited by the rule from engaging in conduct as to which he had a legal or contractual right.

It is true that the town could not enforce the rule for the first time simply to punish Davison for his exercise of his free-speech rights. But neither could Davison simply ignore the rule, on an ongoing basis, as long as he was employed at the fire department. Nor was he entitled to defy his superiors and engage in acts of insubordination.

Thus, even if his initial violation of Rule 22.5 was innocent—and even if the town's enforcement of the rule in the first place was motivated by a desire to retaliate—he did not have the right to operate indefinitely according to his own set of rules. His ongoing violation of the rule, and his ongoing insubordination, gave the town an independent ground for terminating his employment. And there is considerable evidence in the record, not disputed by Davison, that his ongoing violation of the rule and his continued insubordination was the principal basis of the termination decision.

Finally, Davison does not dispute that he made a threatening telephone call to Viveiros. It is true, of course, that he had already received the termination letter (although he would not be terminated for another four months). But even if the town's actions up to that point were not entirely justified, they certainly had a valid basis at that stage for the termination. Indeed, it is difficult to see how the town was not justified in terminating his employment at that stage.

Thus, based on the undisputed facts, defendants have satisfied their burden of demonstrating that they would have terminated Davison even in the absence of the protected conduct. Davison was terminated for violating Rule 22.5, for doing so willfully and repeatedly, for insubordination, and for threatening Viveiros. According to the undisputed evidence, he committed those acts. Summary judgment will therefore be granted to defendants Dunham, Russell, and Corriveau on the claim of Davison for unlawful retaliation in violation of the First Amendment to the extent that that claim is premised on Davison's termination in April 2014.

27

### 2.      Claim of Davison against the Town of Sandwich

A municipality may not be held vicariously liable under § 1983 for the acts of its

employees or agents.  *Monell v. Dept. of Social Servs. of City of N.Y.*, 436 US. 658, 694 (1978).

Rather, a municipality may be liable only when the execution of its "policy or custom, whether

made by its lawmakers or by those whose edicts or acts may fairly be said to represent official

policy, inflicts the injury."  *Id.*  In other words, a municipality may only be liable when it can be

fairly said that the municipality itself caused the constitutional violation at issue.  *City of Canton*

*v. Harris*, 489 U.S. 378, 385 (1989).  A municipality may be responsible for the decisions of its

officers "only where the decisionmaker possesses final authority to establish municipal policy

with respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

Thus, the fact that policymaking official "has discretion in the exercise of particular functions"

does not give rise to municipal liability based on the exercise of that discretion unless that

official is "also responsible for establishing final government policy respecting such activity."

*Id.* at 481-83.  As the *Pembaur* Court explained:

> [T]he County Sheriff may have discretion to hire and fire employees without also
> being the county official responsible for establishing county employment policy.  If
> this were the case, the Sheriff's decisions respecting employment would not give
> rise to municipal liability, although similar decisions with respect to law
> enforcement practices, over which the Sheriff *is* the official policymaker, *would*
> give rise to municipal liability.  Instead, if county employment policy was set by
> the Board of County Commissioners, only that body's decisions would provide a
> basis for county liability.  This would be true even if the Board left the Sheriff
> discretion to their and fire employees and the Sheriff exercised that discretion in an
> unconstitutional manner; the decision to act unlawfully would not be a decision of
> the Board.  However, if the Board delegated its power to establish final employment
> policy to the Sheriff, the Sheriff's decisions *would* represent county policy and
> could give rise to municipal liability.

*Id.* at 483 n.12 (emphasis original).

It is undisputed that Town Manager Dunham made the final decision to terminate

Davison.  However, there is no evidence in the record—nor do plaintiffs even argue—that the

town has a custom or policy of retaliating against employees who exercise their free-speech

rights, or that Dunham had the authority to establish town employment policy.[17]  There is,

therefore, no basis on which to impose liability on the Town of Sandwich and summary

judgment is appropriate on all claims against the town.

### 3.      Claim of Davison against Viveiros

It is undisputed that defendant Viveiros did not have the authority to terminate or

otherwise discipline Davison.  Nonetheless, it appears that there are two theories under which

Viveiros could be liable for First Amendment retaliation.  First, Viveiros could be found liable to

the extent that (1) he participated in a conspiracy, the "principal element of which is an

agreement between the parties to 'inflict a wrong against or injury upon another,'"  *Earle v.*

*Benoit*, 850 F.2d 836, 844 (1st Cir. 1988) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 620-21

(7th Cir. 1979)), and (2) "'there [has] been, besides the agreement, an actual deprivation of a

right secured by the Constitution and laws,'"  *id.* (quoting *Landrigan v. City of Warwick*, 628

F.2d 736, 742 (1st Cir. 1980) (alteration original).[18]  Second, non-employers may be directly

liable for First Amendment retaliation if:  (1) "the plaintiff was engaged in constitutionally

protected activity;" (2) "the defendant's actions caused the plaintiff to suffer an injury that would

chill a person of ordinary firmness from continuing to engage in that activity;" and (3) "the

---

[17] The fact that the town's Board of Selectmen represented the town in its contract negotiations with the firefighters union (Pl. Ex. 8 at 3) suggests that it is likely the Board, and not the Town Manager, that has the authority to establish employment policy.

[18] Defendant Viveiros contends that the complaint does not even allege that he directly violated plaintiffs' First Amendment rights, but only that he participated in a conspiracy to deprive plaintiffs of their constitutional rights.  (Def. Viveiros Mot. for SJ at 12-13).  It is, however, unclear that plaintiffs intended to so limit their allegations.  The complaint states that each individual defendant "conspired with the other Defendants" to deprive plaintiffs of their rights (Compl. ¶¶ 7-10), but also appears to allege that each individual defendant directly retaliated against Davison (Compl. ¶ 48-50).

defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Trant v. Oklahoma*, 754 F.3d 1158, 1169-70 (10th Cir. 2014).

As to the first theory, Davison has failed to show that any of the defendants participated in a conspiracy to deprive him of his First Amendment rights. *See infra* at 35-37. Viveiros therefore cannot be found liable under that theory. As to the second theory, there is no evidence that Viveiros caused plaintiff any injury. Viveiros told Davison that his job might be in jeopardy if he did not take the sign down, but it is undisputed that Viveiros did not have the authority to reprimand or terminate Davison, nor is there any evidence that Viveiros suggested to Russell or Corriveau that Davison be reprimanded or terminated, much less influenced that decision. Furthermore, his warnings about what the department might do in response to Davison's sign do not amount to an injury. Summary judgment will therefore be granted as to defendant Viveiros.

### 4.     Qualified Immunity

Defendants Russell and Corriveau are not entitled to qualified immunity. While true that qualified immunity is often appropriate in cases of alleged First Amendment retaliation by a government employer, it does not appear to be appropriate here. Qualified immunity is generally applicable in such cases because the first two elements of the *Pickering* analysis—whether the plaintiff spoke as a citizen on a matter of public concern and whether his interest in commenting outweigh the governments interest in promoting efficiency—are highly fact-intensive and can "rarely be considered 'clearly established' for purposes of the *Harlow* qualified immunity standard." *McGunigle v. City of Quincy*, 132 F. Supp. 3d 155, 176 (D. Mass. 2015) (quoting *O'Connor v. Steeves*, 994 F.2d 905, 917 n.11 (1st Cir. 1993)). Here, however, those elements are undisputed. The dispute centers only on whether Davison's protected speech was the cause

of his discipline and "[d]ecades of law have clearly established that a public employer may not discipline an employee for protected speech." *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 227 (D. Mass. 2002).

### B. Claim of Cape Cod BioFuels

Plaintiffs also contend that defendants violated the First Amendment rights of Cape Cod BioFuels by impermissibly retaliating against Davison.[19]  It is unclear from the complaint exactly what speech forms the basis of the First Amendment claim brought by Cape Cod BioFuels.[20]  To the extent that it is entirely derivative of the claim brought by Davison individually, that claim necessarily fails, as Davison has conceded that he erected the yard sign in his personal capacity and that Cape Cod BioFuels had nothing to do with it.  (Cape Cod BioFuels Dep. at 32).  Thus, as to the yard sign, Cape Cod BioFuels did not engage in any protected speech in the first place.

To the extent that the claim of Cape Cod BioFuels is premised on the 2012 promotional articles, it fails for a different reason.  As a preliminary matter, commercial speech is accorded fewer protections than private speech.  *Central Hudson Gas & Elec. Corp. v. Public Servs. Comm'n of N.Y.*, 447 U.S. 557, 562-63 (1980).  It is unclear whether the same *Pickering* analysis applies in the context of commercial speech.  However, assuming that it does, and assuming that the interviews quoted in the articles constituted speech made as a citizen on a matter of public concern, the claim of the corporation fails at the second prong of the *Pickering* analysis.  The government's interest in promoting the efficiency of the public services it performs through its employees far outweighs any interest of the corporation in making the speech at issue.  The

---

[19] This claim appears to apply only to defendants Corriveau, Russell, Dunham, and the Town.  There is no allegation that Viveiros took any action in retaliation.  (*See* Pl. Opp. Mem.).

[20] The complaint simply states that "CC BioFuels also exercised its rights and the Defendants, acting under the color of law, punished Mr. Davison for CC BioFuels' exercise of those rights."  (Compl. ¶ 48).

corporate interest here was purely a pecuniary one—to promote Cape Cod BioFuels.  The town's

interest was in promoting the appearance of integrity, enforcing its rules and regulations, and

maintaining employee discipline.  *See Davignon*, 524 F.3d at 104 (stating that maintaining

discipline in workplace is valid government interest).  The town's legitimate interests clearly

outweighed the interest of the corporation in promoting itself.  Therefore, summary judgment

will be granted as to the claim that defendants violated the First Amendment rights of Cape Cod

BioFuels.

### C. <u>Massachusetts Civil Rights Act</u>

Count Two alleges a claim under the Massachusetts Civil Rights Act ("MCRA"), Mass.

Gen. Laws ch. 12, § 11I.  To establish a claim under the MCRA, a plaintiff "must prove that (1)

his exercise or enjoyment of rights secured by the Constitution or laws of either the United States

or the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3)

that the interference or attempted interference was by 'threats, intimidation or coercion.'"  *Bally*

*v. Northeastern Univ.*, 403 Mass. 713, 717 (1989) (quoting Mass. Gen. Laws ch. 12, § 11H).  "A

direct violation of a person's rights does not by itself involve threats, intimidation, or coercion

and thus does not implicate the Act."  *Longval v. Commissioner of Corr.*, 404 Mass. 325, 333

(1989).  Thus, a negative employment decision, even a wrongful one, does not itself violate the

MCRA.  *Butler v. RMS Tech., Inc.*, 741 F. Supp. 1008, 1011 (D. Mass. 1990), *abrogation in part*

*on other grounds recognized in Abrami v. Town of Amherst*, 2013 WL 3777070 at *12 (D. Mass.

2013).

To violate the MCRA, the defendants must have engaged in conduct that a reasonable

person would have perceived as threatening, intimidating, or coercive.  *Planned Parenthood*

*League of Mass., Inc. v. Blake*, 417 Mass. 467, 475-76 (1994).  As interpreted by the

Massachusetts courts, "threats" are defined as "'intentional exertion[s] of pressure [that would] make another fearful or apprehensive of injury or harm.'" *Meuser v. Federal. Express Corp.*, 564 F.3d 507, 519 (1st Cir. 2009) (quoting *Planned Parenthood League*, 417 Mass. at 474) (alternations in original). "Intimidation" is defined as "'putting in fear for the purpose of compelling or deterring conduct.'" *Id.* "'Coercion' is defined as 'the use of physical or moral force to compel [another] to act or assent.'" *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565 (1995) (quoting Webster's New Third Int'l Dictionary 439 (1981)) (alteration in original). At bottom, "[t]here must be something akin to duress" that causes the plaintiff to give up a protected right. *Butler*, 741 F. Supp. at 1011.

There is no evidence that any of the defendants engaged in threatening, intimidating, or coercive conduct within the meaning of the MCRA. While Viveiros allegedly told Davison that he might be terminated if he did not take the sign down, Viveiros did not have the authority to terminate Davison, nor is there evidence that he influenced the reprimand or termination decisions. His warnings did not, therefore, constitute threats within the meaning of the statute. Summary judgment is therefore appropriate as to Count Two.

### D.   Mass. Gen. Laws ch. 41, § 111F

Count Three alleges that the town violated Mass. Gen. Laws ch. 41, § 111F, and the relevant collective bargaining agreement, by requiring Davison to cease any outside employment as a condition of receiving benefits while on leave. Section 111F provides that firefighters injured in the line of duty shall be granted leave without loss of pay for the period of their incapacitation. Mass. Gen. Laws. ch. 41, § 111F. The collective bargaining agreement between the firefighters' union and the town includes the same provision, and states that its provisions shall supersede any conflicting town rule or regulation.

Plaintiffs contend that Rule 22.5 is invalid because, by restricting the receipt of § 111F benefits, it conflicts with the collective bargaining agreement (which, by adopting § 111F guarantees leave without loss of pay).  Plaintiffs nonetheless appear to concede that the town has the right to condition the receipt of § 111F benefits on compliance with various restrictions.  (Pl. Opp. Mem. at 15).  It is well-settled that a municipality may impose various restrictions on firefighters receiving full pay while on medical leave, if those restrictions are rationally related to fostering the efficient operation of the department.  *See Atterberry v. Police Com'r of Boston*, 392 Mass. 550, 556-57 (1984).  Plaintiffs do not appear to dispute the validity of Rule 22.5 on those grounds.  Rather, they contend that Rule 22.5 may not be enforced because it violates the terms of the collective bargaining agreement.

Plaintiffs' contention, however, is not an attack on Rule 22.5 itself, but rather a thinly-veiled claim that the town violated the terms of the collective bargaining agreement by placing restrictions on his right under the agreement to receive pay while on leave.  However, where an "employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced."  *Vaca v. Sipes*, 386 U.S. 171, 184 (1967).  And where, as here, the relevant collective bargaining agreement provides for a grievance and arbitration procedure, an employee may not challenge his employer's alleged breach of the agreement unless he has exhausted the remedial procedures provided for in the agreement itself.  *Hayes v. New England Millwork Distrib., Inc.*, 602 F.2d 15, 18 (1st Cir. 1979).

An exception to that general proscription of judicial review may exist if "the union has sole power under the contract to invoke the higher stages of the grievance procedure, and if . . . the employee-plaintiff has been prevented from exhausting his contractual remedies by the

union's wrongful refusal to process the grievance." *Vaca*, 386 U.S. at 185.  The first requirement appears to be satisfied here, as the collective bargaining agreement states that "the Union and only the Union" may submit an unresolved grievance to arbitration.  (Pl. Ex. 8 at 22). As to the second requirement, Davison has alleged that the union president (Viveiros) falsely stated that union attorney Lenow had told him the September 2012 written reprimand could not be grieved.  (Davison Dep. at 332-34).  According to Davison, Viveiros had not even shown Lenow the reprimand.  (*Id.* at 334).  However, it is undisputed that Lenow did see the letter in January 2014, while reviewing Davison's termination materials.  (*Id.*).  Davison has not alleged that Lenow, Viveiros, or anyone else in the union wrongfully prevented him from using the grievance procedures outlined in the collective bargaining agreement.[21]  Thus, it does not appear that Davison was actually "prevented from exhausting his contractual remedies," and, therefore, he may not now challenge his employer's alleged violation of the collective bargaining agreement in court.  Therefore, summary judgment will be granted as to Count Three.

### E.   Civil Conspiracy

"To establish a civil conspiracy, a plaintiff must demonstrate that 'a combination of persons [acted] pursuant to an agreement to injure the plaintiff.'"  *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 415 (2002) (quoting J.R. Nolan & L.J. Sartorio, Tort Law § 99, at 136 (2d ed. 1989)) (alteration in original).  In other words, "[i]t is not sufficient to prove joint tortious acts or two or more persons;" rather, a plaintiff must show that those acts were taken in furtherance of an agreement to cause injury.  *Id.* (internal quotation marks omitted). Massachusetts recognizes two types of civil conspiracy, "so-called 'true conspiracy' and conspiracy based on section 876 of the Restatement (Second) of Torts."  *Taylor v. American*

---

[21] In fact, it appears that the union is in the process of arbitrating on behalf of Davison.  (Sandwich Mot. for S.J. at 11).

*Chemistry Council*, 576 F.3d 16, 34 (1st Cir. 2009) (citing *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998)).

Under the first theory—a so-called "true conspiracy"—the conspiracy itself is an independent tort. *Fleming v. Dane*, 304 Mass. 46, 50 (1939). To rise to the level of an independent tort, the "force of numbers acting in unison or other exceptional circumstances" must itself constitute a wrong. *Id.* To prove such a wrong, the plaintiffs must show "that there was some peculiar power of coercion of the plaintiff possessed by the defendants in combination which any individual standing in a like relation to the plaintiff would not have had." *Id.* (internal quotation marks omitted). In other words, it must be shown that the combined acts of the defendants brought about a harm that no one of them could have brought about acting alone. *Id.* Here, plaintiffs have failed to make such a showing. The wrongs alleged—reprimanding and terminating Davison allegedly in retaliation for the sign he displayed—could have occurred without the "force of numbers." The decisions of Chief Russell and Town Manager Dunham to reprimand and terminate Davison—even if for retaliatory reasons—do not "in combination [have] any greater or different tortious quality than would be ascribed to the same acts if performed by separate individuals only." *Id.* at 51.

Plaintiffs contends that Deputy Corriveau and Chief Russell did not themselves have the power to coerce him into taking down his sign. (Pl. Opp. Mem. at 17). He contends that they needed Viveiros to "act as their messenger." (*Id.*). It is far from clear, however, what "peculiar power of coercion" the alleged participation of Viveiros added. Plaintiffs appear to assume that because Corriveau and Russell did not themselves directly tell Davison that they were reprimanding or terminating him because of his sign, they could not possibly have coerced him into taking down the sign without the assistance of Viveiros, who did tell Davison that the sign

36

might cost him his job.  However, the absence of direct evidence of retaliation does not amount to affirmative evidence of a conspiracy.

The second theory, based on § 876 of the Restatement, extends liability for the torts of another on the basis of there having been a "concerted action."  *Kurker*, 44 Mass. App. Ct. at 188.  It is, in essence, a form of vicarious liability.  To establish a conspiracy under this theory, a plaintiff must show that there was "a common plan to commit a tortious act where the participants [knew] of the plan and its purpose and [took] affirmative steps to encourage the achievement of the result."  *Id.* at 189 (internal quotation marks omitted).  Here, plaintiffs point to no evidence that such a common plan existed.  (*See* Pl. Opp. Mem. at 17).  Summary judgment will therefore be granted as to Count Four.

## IV.   Conclusion

For the foregoing reasons,

1.      The motion of defendant Jason Viveiros for summary judgment is GRANTED.

2.      The motion of defendants the Town of Sandwich, George Dunham, George Russell, and Thomas Corriveau for summary judgment is GRANTED in part and DENIED in part, as follows:

a.      Summary judgment is granted as to all claims against the Town of Sandwich;

b.      Summary judgment is granted as to all claims against defendant George Dunham;

c.      Summary judgment is granted as to all claims brought by plaintiff Cape Cod BioFuels, Inc.;

c.      As to Count 1, summary judgment is granted as to all claims against defendants George Russell and Thomas Corriveau arising out of the termination of plaintiff Andrew Davison in April 2014, and denied as to the claims of plaintiff Davison against defendants

Russell and Corriveau arising out of the reprimand of Davison in September 2012; and

      c.       Summary judgment is granted as to all claims in Counts 2, 3, and 4.


**So Ordered.**


                                    /s/ F. Dennis Saylor
                                    F. Dennis Saylor IV

Dated: March 24, 2017              United States District Judge